UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MICHAEL J. COLES,

                             Plaintiff,              DECISION AND ORDER
                                                    19-CV-6051 CJS

-vs-

COUNTY OF MONROE, et al.,

                             Defendants.
_____

This matter is before the Court on Defendants' Motion for Summary Judgment on Plaintiff Michael J. Coles' ("Coles") complaint alleging that Monroe County and several of its employees deprived him of his civil rights and were negligent under state law. Order, May 14, 2019, ECF No. 24 (converting Defendants' motion to dismiss to a motion for summary judgment).

For the reasons stated below, viewing all evidentiary proof and reasonable inferences in the light most favorable to Coles, Defendants' motion is granted with respect to all six § 1983 claims. The Court declines to exercise supplemental jurisdiction over the remaining state law claims, and the Clerk is directed to close the case.

## BACKGROUND

On June 12, 2017, Coles' 10-year-old son, JSG, ingested a white substance from a small plastic baggy in the apartment of the boy's mother and her boyfriend, Dalfona Grayson ("Grayson) and Walter Morse, Jr. ("Morse"), respectively. Aff. of Michael J. Coles, ¶ 2–4, June 12, 2019, ECF No. 25-1 ("Coles Aff."). After JSG ingested the

substance, his 6-year-old half-brother, WM, found JSG face-down and unresponsive in a hallway. *Id*. at ¶ 4. The boys were at home alone, so WM ran to a neighbor's for help. *Id*. at ¶ 5. JSG was transported to Strong Memorial Hospital, but passed away the next day. *Id*. at ¶ 6.

Soon thereafter, Tricia Kaplin ("Kaplin") from Monroe County Department of Human Services - Child Protective Services ("DHS") contacted Coles by phone. *Id*. at ¶ 7. In the course of their phone conversation, Kaplin informed Coles that DHS was conducting an investigation into JSG's death, and asked Coles to help with the investigation. *Id*. at ¶ 8. Coles had personally observed Morse selling drugs on multiple occasions in the past, but informed Kaplin that he did not want to get involved for fear of retribution by Morse. *Id*. at ¶ 9. Coles indicated that the only way he would cooperate in the investigation was if his identity would be kept confidential. *Id*. at ¶ 11. Kaplin assured Coles that their conversations would remain confidential, and referred him to the Child Protective Services website to read a posting that suggested it would be against the law to share his identity. *Id*. at ¶ 11-12. Based on Kaplin's representations, Coles agreed to provide information about Morse. *Id*. at ¶ 13.

On the same day that he was contacted by Kaplin, Coles also received a call from an individual with the Monroe County Sheriff's Office seeking assistance with a Sheriff's investigation into Morse.[1] *Id*. at ¶ 14–15. Coles again indicated that he

_____

[1] In his original complaint, Coles identified this individual as Defendant Sheriff's Officer Andrew

did not want to get involved for fear of retribution by Morse, and that he would only cooperate if his identity would remain confidential. *Id.* at ¶ 16. The detective assured Coles that their discussions would remain confidential, and Coles agreed to meet the detective. *Id.* at ¶ 17–18.

Coles met with the detective and his associates on two occasions and shared what he knew about Morse. *Id.* at ¶ 18–21. At the second meeting, the detective informed Coles that he should "lay low" because the DHS investigation report was being sent to Morse with Coles' name in it, after all. *Id.* at ¶ 23, 26. The detective attempted to stop the report from being distributed to Morse, but he was unsuccessful. *Id.* at ¶ 28.

Approximately two weeks later, Coles received a phone call from a friend informing him that Morse was "telling people [Coles] snitched on him and that he was going to get [Coles]." *Id.* at ¶ 29. Coles began to believe Morse was stalking him and would harm him, so Coles contacted the Sheriff's detective. *Id.* at ¶ 31. The detective again counseled Coles to just "lay low," but neither promised nor gave any additional assistance. *Id.* at ¶ 32.

On October 19, 2017, as Coles was walking down the street, Morse fired multiple gunshots at him from behind a van. *Id.* at ¶ 32-34. Three of the shots hit

---

Delyser. Compl., ¶ 43, Jan. 16, 2019, ECF No. 1. However, in his 50-h Hearing testimony, Coles admitted that he did not remember the name of the individual who contacted him. 50-h Hrg. Tr., 9:20, Feb. 4, 2019, ECF 4-1. In his affidavit, Coles referred to this individual simply as a "detective." *See, e.g.,* Coles Aff. at ¶ 15. For the purposes of this decision and order, we will adopt Coles' language and refer to the individual who contacted him from the Sheriff's Department as a "detective."

Coles in the legs, resulting in six wounds from the entry and exit of the bullets. *Id.* at ¶ 33, 35, 37. Due to the wounds, Morse was hospitalized on at least three occasions, and underwent surgery. *Id.* at ¶ 38–43. Coles states that as a result of his injuries, he often loses feeling in his legs, is in constant pain, and suffers from post-traumatic stress disorder. *Id.* at ¶ 44–45.

Coles filed a complaint against the County of Monroe, the County of Monroe Department of Human Services (DHS), DHS Commissioner Corrinda Crossdale, DHS Caseworker Trisha Kaplin, DHS Caseworker John Does #1-5, individually, County of Monroe Sheriff's Department ("Sheriff's Department"), Sheriff's Officer Andrew Delyser, and Sheriff's Department Officer John Does #1-10, individually. Compl., Jan. 16, 2019, ECF No. 1. The complaint alleges seven causes of action: (1) a claim against all defendants under 42 U.S.C. § 1983 for violation of his Fifth and Fourteenth Amendment[2] rights for deliberate indifference to his rights; (2) a claim under 42 U.S.C. § 1983 for violation of his Fifth and Fourteenth Amendment rights for failure to protect against DHS, DHS Kaplin, DHS Crossdale, and DHS John Does; (3) a claim under 42 U.S.C. § 1983 for violation of his Fifth and Fourteenth Amendment rights for failure to protect against the Sheriff's Department, Sheriff's Officer Delyser, and Sheriff's Officer John Does; (4) a claim under 42 U.S.C. § 1983 for failure to supervise and failure to train against Monroe County, DHS and DHS

---

[2] In his papers, Coles also alludes to a violation of his rights under the Fourth Amendment, but later conceded that "the Complaint does not state a cause of action for violation of Plaintiff's Fourth Amendment rights." Resp., 6, June 11, 2019, ECF No. 25-2.

Crossdale; (5) a claim under 42 U.S.C. § 1983 for failure to supervise and failure to train against Monroe County and the Sheriff's Department; (6) a *Monell* claim against the County; and (7) a state law claim for negligence against all Defendants. *Id.*

Defendants filed a motion to dismiss for failure to state a claim, or alternatively to convert to a motion for summary judgment. Mot. to Dismiss, Feb. 4, 2019, ECF No. 4. After a full briefing of the issues, the Court converted Defendants' motion to dismiss to a motion for summary judgment and invited additional briefing. Order, May 14, 2019, ECF No. 24. In his response papers, Coles stated that he "does not oppose summary judgment with regard to the § 1983 federal causes of action solely as against Defendants DHS and the Sheriff's Department." Resp., 6, June 11, 2019, ECF No. 25-2.

SUMMARY JUDGMENT

<u>Timing of the Summary Judgment Motion</u>

As an initial matter, Coles disputes the appropriateness of summary judgment at such an early stage of litigation. Through counsel, Coles states:

> Discovery on the following issues, all of which are exclusively within the control of Defendants, must be conducted before Plaintiff will be able to adequately present the facts essential to both prosecute the causes of action in the Complaint and justify its opposition:
>
> a. Extent of [DHS] Commissioner Corinda Crossdale's personal involvement in the events alleged in the Complaint[.]
>
> b. Defendants' policy of hiring, training, retention, and supervision that resulted in Plaintiff's injuries as alleged in the Complaint[.]
>
> c. The actual person or persons who were involved in the decision to

5

release the unredacted Report that is the subject of this lawsuit.

d. Defendants policy and or practices regarding redacting the names of informants before releasing Reports to the subjects of same.

e. Whether the decision to release the unredacted Report was part of a policy, practice or custom of the Defendants.

f. The extent of Defendants' knowledge regarding Morse's intentions to harm Plaintiff.

g. Whether Defendants undertook any preventative measures to prevent the unredacted Report's release to Morse.

Resp., ¶ 8, June 11, 2019, ECF No. 25.

The Court notes that generally summary judgment is not appropriate until after some discovery has occurred in a case. *Nelson v. Deming*, 140 F. Supp. 3d 248, 257 (W.D.N.Y. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Indeed, as the Second Circuit has stated, "[o]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97. However, Federal Rule of Civil Procedure 56 states that a party may move for summary judgment "*at any time* until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b) (emphasis added). Further, "an opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of [a summary judgment] motion." *Gray v. Town of Darien*, 927 F.2d 69, 74 (2d Cir. 1991). Hence, "where it is clear that the nonmoving party cannot defeat the motion by showing facts sufficient to require a trial for resolution,

summary judgment may be granted notwithstanding the absence of discovery."
*Nelson*, 140 F. Supp. 3d at 257 (internal citations and quotation marks omitted).

For reasons that are discussed more completely below, the Court finds that the present case is such a rare case in which summary judgment may be granted before the plaintiff has had the opportunity to complete discovery. In addition to the parties' memoranda of law, the materials submitted for consideration on this summary judgment motion are affidavits from the attorneys and the plaintiff, Coles, and a transcript of Coles' statutory hearing under New York General Municipal Law § 50-h. ECF Nos. 4-1, 25-1. Viewing the evidentiary proof in a light most favorable to Coles, the non-movant, and according him all reasonable inferences to be drawn from such proof, the Court nonetheless concludes that Coles cannot defeat the motion by showing facts sufficient to require a trial for resolution. *Nelson*, 140 F. Supp. 3d at 257.

Summary Judgment Standard

"The role of the court on a motion for summary judgment is not to try issues of fact but only to determine whether there are issues of fact to be tried." *Vann v. City of New York*, 72 F.3d 1040, 1048–50 (2d Cir. 1995). For the court to grant summary judgment, the movant must "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). A genuine dispute as to a material fact exists if "the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Where, as here, the burden of persuasion at trial would be on the non-moving party . . . the party moving for summary judgment may satisfy his burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988). Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

## DISCUSSION

<u>Threshold Question in all § 1983 Claims</u>

42 U.S.C. § 1983 allows an individual to bring suit against persons who, under color of state law, have caused him to be "depriv[ed] of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. However, § 1983 does not create substantive rights; "it merely provides remedies for deprivations of rights established elsewhere." *City of Okla. City v. Tuttle*, 471, U.S. 808, 816 (1985). Therefore, "[t]he first inquiry in any § 1983 suit [is] to isolate the precise constitutional violation with which [the defendant] is charged". *Baker v. McCollan*,

443 U.S. 137, 140 (1979). *See also, Cty. of Sacramento v. Lewis*, 523 U.S. 833, 842 n. 5 (1998) ("the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all"); *Matican v. City of N.Y.*, 524 F.3d 151, 154 (2d Cir. 2008) (the "single threshold question" is whether defendants violated plaintiff's constitutional rights).

Coles brings all six of his § 1983 claims, against both municipal and individual Defendants, for violations of his due process rights under the Fifth and Fourteenth Amendments. Although the distinction is largely academic, the Court notes that the Fourteenth Amendment's Due Process Clause, not that of the Fifth Amendment, governs conduct by state actors and tailors its analysis accordingly. *Howard v. Town of Bethel*, 481 F. Supp. 2d 295, 298 n. 4 (S.D.N.Y. 2007) (citing *Dusenbery v. United States*, 534 U.S. 161, 167 (2002)).

Substantive Due Process Under the Fourteenth Amendment

"[T]he Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing [its] power, or employing it as an instrument of oppression." *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 196 (1986) (internal citations and quotation marks omitted). The clause has "both a procedural component protecting against the denial of fundamental procedural fairness, . . . as well as a substantive component guarding the individual against the exercise of power without any reasonable justification in the service of a legitimate

9

governmental objective." *Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007) (internal citations and quotation marks omitted).

Among other things, substantive due process under the Fourteenth Amendment protects an individual's right to bodily integrity free from unjustifiable government interference. *Id.* (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). However, it does not require "the State to protect the life, liberty, and property of its citizens against invasion by private actors," nor does it confer an "affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney*, 489 U.S. at 195–96.

The Second Circuit has recognized two exceptions to this general principle:

> First, the state or its agents may owe a constitutional obligation to the victim of private violence if the state had a "special relationship" with the victim . . . Second, the state may owe such an obligation if its agents in some way had assisted in creating or increasing the danger to the victim.

*Matican v. City of New York*, 524 F.3d at 155 (citation omitted). Still, claims that fall within either of the above two exceptions face a further hurdle, "lest the Constitution be demoted to . . . a font of tort law." *Lewis*, 523 U.S. at 848 n. 8 (1998). Specifically, the defendant's conduct must also be found to be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Matican*, 524 F.3d at 155 (quoting *Lewis*, 523 U.S. at 848 n. 8) (internal quotation marks omitted).

<u>The "State-Created Danger" Exception</u>

Here, Coles argues that "Defendants are liable under § 1983 because Plaintiff's substantive due process rights were violated under the state-created danger [exception]." Resp., 16, ECF No. 25-2. Defendants contend that there was not a state-created danger and that, even if there was, their conduct does not shock the conscience. Mem. of Law, 19–20, Feb. 4, 2019, ECF No. 4.

The Second Circuit has held that "the state-created danger exception requires some form of affirmative, rather than passive, conduct on the part of a government actor that communicates, explicitly or implicitly, official sanction of private violence." *Okin v. Vill. Of Corwall–on–Hudson Police Dep't*, 577 F.3d 415, 429 (2d Cir. 2009) (citations and internal quotation marks omitted). In applying this requirement, the Second Circuit has "sought to tread a fine line between conduct that is 'passive' . . . and that which is 'affirmative' . . . ." *Pena v. DePrisco*, 432 F.3d 98, 109–10 (2d Cir. 2005).

With respect to the present case, both parties point to the Second Circuit's decision in *Matican* as instructive. Coles argues the Court should take notice of the fact that the *Matican* panel found a state-created danger in circumstances similar to those faced by Coles. Resp., 17, ECF No. 25-2. Defendants, on the other hand, argue the Court should note that the *Matican* panel ultimately ruled against the plaintiff because it found that the defendants' conduct was not so egregious or outrageous as to shock the conscience. *See*, *e.g.*, Reply, 5, June 12, 2019, ECF No.

26.

In *Matican*, the plaintiff was arrested for purchasing crack cocaine from a drug dealer, but the police offered to drop the charges if he helped to apprehend the dealer. *Matican*, 524 F.3d at 153. The plaintiff expressed concern that if he helped, the dealer would harm him if the dealer made bail. *Id.* The police responded, "Don't worry . . . we will look after you." *Id.* The plaintiff then agreed to participate in a sting operation and called the dealer to arrange the purchase of a large quantity of cocaine at a particular location. *Id.* As the dealer approached the location, he was intercepted by police and arrested. *Id.* at 153–154. Months later, the dealer, whose violent criminal history was unknown to the plaintiff, was released on bail and attacked the plaintiff in the streets. *Id.* The Second Circuit found that the fact that "the officers planned the sting in a manner that would lead [the dealer] to learn about [plaintiff]'s involvement [was] sufficiently affirmative to qualify as a state-created danger." *Id.* at 158 (citing *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1063 (9th Cir. 2006)). Nevertheless, the circuit court ultimately ruled against the plaintiff because it found that the officers' conduct did not shock the conscience. *Id.*

Application to Coles' Circumstances

Here, applying the standard of law articulated above, the Court assumes without finding that the Defendants' conduct constituted a state-created danger for § 1983 purposes. Coles stated that he feared Morse, a known drug dealer, would retaliate for any cooperation in both the DHS and the Sheriff's Department

12

investigations.   Coles Aff. at ¶ 9–13, 16.   Coles also stated that the only reason he cooperated was because he had been assured of confidentiality.   *Id.*   It is further clear from the record that Coles' cooperation did not remain confidential, that it was made known by DHS and/or the Sheriff's Department, and that Morse did indeed retaliate against Coles.   *Id.* at ¶ 25–30.

Yet even if Defendants' conduct constituted a state-created danger, the Court nonetheless concludes that such conduct – individually and collectively – does not rise to the level of a constitutional violation because it does not shock the contemporary conscience.   *Matican*, 524 F.3d at 159.

In discerning whether or not conduct shocks the contemporary conscience, the Supreme Court has stated that "negligently inflicted harm is categorically beneath the threshold," while "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849.   "In between, the Supreme Court has recognized that conduct exhibiting 'deliberate indifference' to harm can support a substantive due process claim."   *Lombardi v. Whitman*, 485 F.3d 73, 82 (2d Cir. 2007).

However, courts must bear in mind that "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another."   *Lewis*, 523 U.S. at 850.   In particular, the Supreme Court and the Second Circuit have both found that "deliberate indifference" in the face of conflicting obligations cannot be deemed

conscience-shocking. *Lombardi* at 82. "When great harm is likely to befall someone no matter what a government official does," the Second Circuit has said, "the allocation of risk may be a burden on the conscience of the one who must make such decisions, but does not shock the contemporary conscience." *Id*. at 85.

Coles does not allege, nor can it be inferred from the record, that any individual or group within DHS or the Sheriff's Department took steps to intentionally or directly cause harm to him. In fact, Coles admits that the detective both contacted him to warn him that the report was being released to Morse with Coles' name in it, and that he attempted to stop the distribution of the report. Coles Aff. at ¶ 23, 28. Further, Coles stated that after he alerted the detective to the fact that he believed Morse was stalking him, the detective discouraged him from participating any further in the investigation, cautioned him to "lay low," and did not make any further promises that would have led Coles to rely on the detective's assistance. Tr. 50-h Hearing, 22:2–4; Coles Aff. at ¶ 32. The alleged constitutional violation, then, necessarily centers upon the conduct of the DHS and Sheriff's department investigations, and the release of the report.

The Court finds that in conducting their investigation into JSG's death, whether or not they created danger for Coles or exhibited "deliberate indifference" to his plight, Defendants' conduct does not shock the contemporary conscience because they had the burden of allocating risk among several competing obligations. *See Lombardi*, 485 F.3d at 82. In addition to Coles' safety, the individuals employed by

DHS had to consider, *inter alia*, the well-being of JSG's 6-year-old half-brother, who had been temporarily removed from the home after JSG's death; the mother's parental rights; and Morse's statutory rights to view the report on abuse or neglect. *See, e.g.,* N.Y. Soc. Serv. Law § 422(4)(d) (McKinney); Tr. 50-h Hearing, 8:2–11, Feb. 4, 2019, ECF No. 4-2. The individuals in the Sheriff's Department had to consider, among other things, Coles' safety, the public's interest in resolving the cause of JSG's death, and the limited resources at the department's disposal to maintain public safety. *See, e.g.,* Tr. 50-h Hearing, 9:24–25.

In this context, each of the Defendants could reasonably have concluded that these various interests required the release of the unredacted report even if that report put Coles in greater danger. *Id.* For these reasons, the Court finds that the conduct of Defendants' does not shock the contemporary conscience and, therefore, Coles' constitutional rights were not violated.

Coles' § 1983 Claims Fail

Demonstrating violation of a constitutional right is an essential element of all of Coles' § 1983 claims. To prevail on a § 1983 claim against an individual, a plaintiff must show: "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law, and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999). To prevail on a § 1983 claim against a municipality for failure to train or supervise, a plaintiff must show: (1) the policy-maker knows to

a "moral certainty" his employees will face a given situation; (2) the situation has either been historically mishandled or presents the employee with a difficult choice that will be made less difficult through training or supervision; and (3) that the wrong choice by an employee will frequently cause deprivation of a citizen's constitutional rights. *Walker v. City of New York*, 974 F.2d 293, 297–298 (1992). Finally, to prevail on a *Monell* claim against a municipality under § 1983, a plaintiff must establish: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell v. Dep't. of Soc. Servs. of N.Y.*, 436 U.S. 658, 690–91 (1978)).

By failing to demonstrate a constitutional violation, Coles has failed to demonstrate an essential element of all of his § 1983 claims against both the municipality and the individual defendants. Accordingly, the Court grants Defendants' motion for summary judgment on all six of Coles' § 1983 claims.

## CONCLUSION

For the above stated reasons, Defendants' motion for summary judgment is granted with regard to Coles' claims under 42 U.S.C. § 1983. Further, the Court declines to exercise supplemental jurisdiction over any remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3), which claims are hereby dismissed without prejudice. The Clerk is directed to close this case.

IT IS SO ORDERED.

Dated:       February 3, 2020
             Rochester, New York

                                   /s/ Charles J. Siragusa
                                   CHARLES J. SIRAGUSA
                                   United States District Judge